Good morning. My name is Kari Hong, and I represent Plaintiff Appellant Leanne Rouse. There are three reasons why the district court's dismissal of the suit was erroneous. First, dealing with the issue on the merits, Mr. Rouse stated four causes of actions under the Privacy Act that can be sustained. The district court preliminary dismissed all of the causes of action on the basis of causation. As a preliminary matter, the third cause of action, the access right under D-1, does not have a causation element. At a minimum, the third cause of action must be reinstated. Turning to the other issues, Justice Sotomayor, what do we know about the issue of whether there's a private right of action under this legislation at all? Under G-1C and G-1D, there is a civil action if the agency fails to maintain the record necessary to assure fairness and determination of benefits to an individual and, consequently, the — an adverse determination is made. We contend in that instance Mr. Rouse had an ability to have a — a fair determination of whether diplomatic protests were warranted under his circumstances. I'm sorry, but that's quite a leap, is it not? Certainly there arguably is a private right of action with respect to correction of the records or forcing the agency to be — keep accurate records, but it seems to me that you're kind of bootstrapping from that on to a conclusion that some sort of diplomatic intervention should have been mandated. Well, under the FAM, the — the citing 412, there is a right and a duty for the embassy to report information to the State Department. What we have here is that the embassy withheld, omitted, and lied to the State Department regarding the unfair arrest and the unfair trial that occurred in this case. Do you have any proof from a Department of State employee that would establish that had this information been made available to the Department of State, a responsible and authorized employee of the Department of State would, in the normal course of his duties, his or her duties, take up representations with the Philippine government, which would have no doubt eventuated in the case being dropped? Well — Yes or no? There's an allegation because it's at the pleading stage. Is there any evidence in the record that had this information been known to the Department of State, step one, the Department of State would have taken action, step two, and that action would have eventuated in the dismissal of charges in the Philippines, step three? Anything like that? No, but I would contend that that was the mistake made by the district court, that the district court believed that the harm was tied to the continued and the actual imprisonment. The harm here is that there was never a fair determination by the State Department whether diplomatic efforts should be exercised. The U.S. — three U.S. senators, three U.S. representatives asked for information. They said, is there any evidence of a fair trial? Each time, the embassy said, no, there's nothing here, and in fact, they went further to say that this was a proper trial. So isn't it sort of speculative whether if Senator Feingold had been told that there was an unfair trial in the Philippines, he would have, A, done anything, B, whether his doing anything would have eventuated in any result? All Mr. Rouse wanted was a fair determination about whether those efforts — whether he was entitled to those efforts. And — No, he wants line points. Counsel, Judge Kuhl, I have a question for you. It's — it may be along similar lines to what I think is concerning Judge Bea, but I would state it more generally. The concern I'm having that I'd like you to address is simply that I'm not really understanding what causal connection is shown between the asserted failure to keep accurate records on the one hand and a continued incarceration, which is the basis of the damages claimed, as I understand it, on the — on the other. That is, what is the evidence of a causal connection between sketchy or false records and continued incarceration? I think probably the best answer would be the original letter that the embassy wrote and gave to the Philippine judge, complaining about the problems in the trial and complaining about the discrimination against the U.S. citizen. In that letter, the embassy said, respond to us in three days or we're going to take this up the ladder. We're going to bring this up to the minister of justice if you don't respond. That was an avenue that was available that they threatened to use. The judge read that into the record and then never responded to the embassy, and then the embassy never did anything. If this was simply a speculative matter, if the embassy had never initiated that letter, I would agree that there's no cause of action here. But the problems at the embassy and found problems with the trial, contacted the judge, exercised diplomatic efforts, and then when asked about the State Department, are their efforts necessary, are they warranted, simply said everything's fine, we aren't going to do anything, nothing needs to be done. It is that turnabout, which is inexplicable and I would contend leads to the causation that attention needed to be brought to this case. When the U.N. was — You can say attention needs to be brought, but still what is the evidence that the lack of attention caused by faulty — that faulty records caused a lack of attention, which in turn caused continued incarceration? I would contend when there was accurate information given to the U.N. by Mr. Rouse directly, the U.N. determined that there was an unfair trial, issued the lengthy statement, and petitioned the Philippine government directly enumerating all the human rights violations that occurred in Mr. Rouse's trial. If the State Department could have done that, should have done that, and if they had accurate information from the embassy that there were those problems that the U.N. found to be true, that they could have put pressure on the embassy to release Mr. Rouse earlier. The U.N. letter came in eight years into Mr. Rouse's incarceration, then he was released. Has the Philippine government compensated Mr. Rouse as a result of the U.N. letter? Not that I'm aware of, but it did lead to an early release. He was sentenced to a minimum of 10 years and a maximum of 17 years' terms. He was released eight years and was shortly after the U.N. letter. I think arguably if the embassy had issued that letter in year one, he would have been able to get out. Well, you just told us about an effort which was indeed made by the embassy before the Philippine court. Doesn't that suggest, I mean, it would be counterintuitive to suggest that any further action would have made any difference. Well, no, because the embassy said we are going to take this up to the minister of justice, we're going to bring it to the president, we can bring it to the ambassador. And the problem was that when any time the State Department, which is the proper vehicle to launch this protest, when they asked are there any problems, the embassy said no and never gave them the letter that they had already lodged. That part doesn't make sense, and that part is a violation of Mr. Rouse's violations. Counsel, I may be using up your final time with my question, so possibly, Judge. So, Scanlon, we'll give you an extra minute on rebuttal, but what about addressing the statute of limitations? Why couldn't he have brought these claims earlier? Because it seems like he was set up, you know, in prison to have access to reading and writing and so on. I would respectfully contend that that's addressed under Cervantes, which provides that dismissal for equitable tolling or a failure to file a complaint within the statute of limitations is something that must be addressed at the summary judgment level after discovery and after hearing on the facts. Cervantes said a dismissal at the motion to dismiss is only appropriate if there's a clear defect, which would be naming the wrong defendant or failure to exhaust a state claim. We don't have that on the record. It's very cognizable that under Evans, under Spitson, under Miles, that being incarcerated in a foreign prison would prevent someone from appearing in a district court, complying with discovery, deposing witnesses, conducting the investigation that's needed to file a complaint in the district court. But he was able to file a complaint with the United Nations in 2002. He was able to send a letter, but that's very different than litigation. As a solo, I don't do private litigation in the district court because it's too extensive. I mean, it could have been dismissed if he had missed a discovery deadline or eliminated a deadline. And what's most important, though, Cervantes directs an evidentiary hearing on that question. Counsel, at the request of Judge Gould, I will allow a one-minute rebuttal, but your time now has expired. Thank you. Good morning. May it please the Court. My name is Derek Watson from the United States Attorney's Office. On behalf of the United States Department of State. Mr. Watson, that microphone in front of you is not for the purpose of amplifying your voice. It is for the purpose of the transcription. So I would convey that you please speak up. Yes, Judge Behar. Again, it's Derek Watson from the United States Attorney's Office, District of Hawaii, on behalf of the Defendant Department of State. I wanted to begin, Your Honors, with an answer to just Judge Gould's last question, and that's with regard to the statute of limitations, because if the judges reach that question first, the rest of it goes away. With regard to the statute of limitations, Cervantes is not case dispositive. There are other cases, both by the Supreme Court in the Irwin decision as well as by this circuit in the Jablon case, which hold that statute of limitations and equitable tolling specifically can be adjudicated at the motion-to-dismiss stage in the appropriate circumstance, and that is exactly this case. This is not a situation where there is a question of accrual. There's a question of the time limitations applicable to a Privacy Act claim. Plaintiffs have conceded both of those issues in their opening brief at pages 28 and  29. The sole question before this Court is the issue of equitable tolling. If this complaint were devoid of any reference to the 95 or so pages of exhibits attached to the complaint, then I would submit that there is not sufficient information to conclude one way or the other whether equitable tolling is appropriate. But that's not the circumstance. We have ample evidence described at length in the government's brief of why Mr. Rouse was able to litigate appropriately here in this Court. And counsel has pointed out this morning, as she did in her brief, issues that go on during the course of litigation, such as depositions, status conferences, and the like, that she claims he might have been have difficulty to do while incarcerated in the Philippines. But that does not address the issue of why he was not able to file to initiate the lawsuit. Her argument this morning, as well as in her brief, does not address that question. And that's the sole question that this Court needs to grapple with with regard to statute of limitations. There's nothing in the record at all that suggests that he wasn't able to file his complaint, and, in fact, ample evidence that he could have. I want to get back to a couple of the other questions that the Court has asked this morning. Specifically, Judge Gould, again, asked about the connection between the faulty record or faulty record-keeping and the complaint that he was incarcerated for eight years and why — where is the connection between the two. I would submit that that is only part of the inquiry that has left us puzzled. The plaintiffs have not identified any record that was inaccurate. We've — a fair reading of the complaint leaves us puzzled about that. And that certainly does not satisfy Federal notice pleading requirements. Not a single document in his Philippine embassy files is identified as faulty in the plaintiff's complaint. Beyond that, there is no — because there's no record cited, there's no evidence or there's no pleading about how a record was faulty. And then, again, as Judge Gould mentioned, there's no third-link connection between the alleged faulty record and what Mr. Rouse was complaining about. A couple other points that I wanted to make sure I got in this morning. With regard to the way — what counsel started off with this morning, and that's the third cause of action, Mr. Rouse's third cause of action, his access claim. That is not a claim that ought to proceed at a minimum, as she claimed. His access claim is, in fact, moot. It's plain on the face of the pleading at paragraphs 17, 18, and 19 of the complaint that he, in fact, received the embassy file that he claims that his access claim is based on. And if that — those three paragraphs were not clear enough, Judge King had the foresight during the hearing on the government's motion to dismiss, and I cite the Court to the Mr. Rouse admitted to the Court, admitted to Judge King on questioning that he, in fact, did receive the file that he had asked for and was not contesting the issue of access. So under the Court's holdings in the Mumm case, the Lovell case, his access claim is moot. Moreover, even if it were not, he's pursuing a damages-based remedy, $9.2 million. That's the only thing he's looking for. Damages are not available under the Privacy Act for an access claim. So even if he had one, he couldn't get damages. The only thing you can get in an access issue is attorneys' fees and litigation costs. As we know, Mr. Rouse was not represented by counsel at the time, in 2000 and 2002, when these issues arose. Therefore, he did not have any attorneys' fees, and there was no litigation until 2006. So there couldn't have been any litigation costs either. The last thing I wanted to mention is Plaintiff's repeated attempts to recharacterize Plaintiff's actual claims. I don't think Judge King got it wrong at all in his five-page order, where he characterizes Plaintiff's claims as an attempt to blame his incarceration or the failure to commute his eight-year sentence on the Department of State. That's exactly what he pled. Now, they have come back in briefing before this court and tried to assert that, no, what we're really complaining about is the lack of record keeping that led to the failure to have my right to diplomatic protests enforced. That is nowhere in the complaint. That's something that's solely in the Ninth Amendment in this court. But even if you accept their characterization, there is no right to diplomatic protest beyond what the post, and that's what it says in the Foreign Affairs Manual, the same manual that Plaintiff's counsel cited this morning. There's no right to a diplomatic protest beyond what is left to the discretion of the post. And Judge O'Scanlan mentioned only one of those efforts this morning. The letter that was sent by the consular officer to the judge in 1996 was the tip of the iceberg. In fact, the State Department, the U.S. Ambassador to the Philippines, made two separate entreaties in February of 1997 on Mr. Rouse's behalf. Is that in the record? Yes, it is, Your Honor, at Supplemental Excerpt of Record, page 66 and 67. And what the U.S. Ambassador did was he contacted both local officials and a Philippine congressman to take up Mr. Rouse's claims. So the diplomatic efforts of the United States Department of State did not end with a simple letter in 1996 by a consular officer, although that's even more than Mr. Rouse was, quote-unquote, entitled to. He got more representation, as it were, through the United States Ambassador to himself. And what Mr. Rouse is now complaining about is that the U.S. Department of State didn't take up his cause with the Philippine head of state, the president of the Philippines. If that is the right of every U.S. citizen, I'd like to see where that's written anywhere in the law, in the statute, regulations, or the Foreign Affairs Manual of the State Department, unless the Court has any further questions. No questions, counsel. Thank you. Thank you, Your Honor. No questions. Ms. Hong, you have one minute. It's a couple of corrections of fact. The ambassador and the embassy does not have the discretion to determine what diplomatic efforts are justified. FAM 41514 expressly says that the consular officer must or should bring the opinion and information to the attention of the State Department to make that determination. That did not occur. Returning to some of the points, statute of limitations, section G-5 expressly contemplates that an action can be filed outside the two-year period when, quote, an agent has materially and willfully misrepresented any information to be disclosed to an individual that's material. By the wording of the statute, it contemplates a possibility that the action can be filed outside of the two-year period. Opposing counsel also said that Mr. Rouse never cited an accurate record. My opening brief and my reply brief is filled with the exact communications made by U.S. senators, U.S. congressmen, the State Department asking for information, and the embassy's lies and omissions and misrepresentations saying that the privacy waivers don't exist, they weren't signed, and nothing happened to him, and he had a fair trial. Finally, I'd just like to remind the Court that under Nolan Eldridge, the district court erred by dismissing this case with prejudice. As a pro se litigant, the district court has to point out the deficiencies and give one opportunity to amend. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision, and we will hear argument next in Progressive Gulf Insurance v. Fainrich.
judges: O'scannlain, Gould, Bea